IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiffs,<br><br>vs.<br><br>DONALD GREUTER, and TRICIA EASLEY,<br><br>Defendants. | 4:20CR3080<br><br>**FINDINGS, RECOMMENDATION, AND ORDER** |

Defendant Donald Greuter was indicted by a grand jury in the District of Nebraska on July 24, 2020, for possession of firearms and ammunition by a prohibited person in violation of Title 18 U.S.C. 922(g)(1), 924(a)(2), and 924(e)(10). (Filing No. 1). He now moves to suppress all evidence and statements obtained during the search of his home and his adjacent property in Upland, Nebraska on January 8, 2020. (Filing No. 93-1). Greuter was on parole at the time of the search and was subject to conditions of parole, including a search and seizure condition. Nonetheless, Defendant claims that there was neither reasonable suspicion nor probable cause for the search, and that prior "routine" searches by his parole officer created or reinforced an expectation of privacy. Thus, he claims, the unannounced visit and search of his properties violated the Fourth Amendment. For the reasons contained herein, the motion to suppress should be denied.

STATEMENT OF FACTS

After hearing the testimony, observing the witnesses, and reviewing the documentary evidence, the undersigned magistrate judge finds the following facts are credible.

Defendant Greuter was convicted in the District Court of Buffalo County, Nebraska on charges of attempted distribution of methamphetamine, a Class III felony for which he was sentenced to 9-15 years, and distribution of marijuana, a Class III felony for which he was sentenced to 4-10 years. (Filing No. 101-4). The sentences were ordered to run consecutively. Greuter was granted parole effective September 24, 2014. Greuter signed a Certificate of Parole allowing him to be released provided that he agreed to conditions of parole and to supervision by a Nebraska parole officer. (Filing No. 115 at CM/ECF pp. 45-46). The certificate was witnessed and signed by five Parole Board members. The certificate included a search and seizure requirement which stated:

> You shall permit your parole officer and/or personnel of Parole Administration to conduct routine searches of your person, residence, vehicle or any property under your control, at such times as they deem necessary.

(Filing No. 93-2 at CM/ECF p. 2; Filing No. 101-5 at CM/ECF p. 3).

Defendant met with his parole officer and participated in orientation on September 29, 2014. (Filing No. 101-6). Parole officers review the certificate of parole and the guidelines and special conditions that apply to each parolee and answer any questions the person may have. (Filing No. 115 at CM/ECF p. 11).

Craig Williamson became Greuter's primary parole officer, supervising his parole and conducting home visits from 2014 through the time of Greuter's arrest in January 2020. (Filing No. 115 at CM/ECF p. 12). Williamson met with Greuter approximately every two months, arranging to meet Greuter at his home at a specific time, or meeting at Greuter's job site so he would not miss work. (Filing No. 115 at CM/ECF p. 13).

Greuter owned two adjacent properties on the same street; one where Greuter resided with his girlfriend, and the adjacent property, which was reportedly vacant. The parole officer's visits occurred Greuter's residence, with Williamson providing advanced notice of each visit for safety reasons. During the home visits, Williamson typically knocked on the front door. After Greuter opened the door, he would walk with Williamson through the living room area to his kitchen, and they would sit at the kitchen table. (Filing No. 115 at CM/ECF pp. 13-16). Williamson also routinely opened the refrigerator to look for alcohol or contraband. (Filing No. 115 at CM/ECF p. 70).

In December 2019, Williamson received information from Investigator Kyle Kuebler of alleged parole violations occurring at Greuter's home. Although Kuebler received information in 2018 and 2019, Kuebler waited to contact Williamson until after receiving a federal proffer statement and corroborating that statement with information found in the law enforcement database. (Filing No. 115 at CM/ECF p. 135). Specifically, Kuebler told Williamson that Greuter was selling methamphetamine and marijuana in the Kearney area and that he was the main distributor to that area. (Filing No. 115 at CM/ECF p. 18). Williamson asked for further details and Kuebler disclosed the following detailed allegations collected by law enforcement from multiple sources regarding Greuter:

- In 2018, Kuebler was informed that Greuter was being supplied with 25-30 pounds of marijuana and 10 pounds of methamphetamine. The drugs were delivered either monthly or bimonthly by Johnny Davis, a resident of Oregon who had previously resided in Minden, Nebraska. (Filing No. 115 at CM/ECF p. 132). The informant said Greuter kept the drugs in one of Greuter's residential properties. (Filing No. 101-8). Through his investigation, Kuebler learned that Davis had at least three vehicles registered at Greuter's home address. (Filing No. 101-7 at CM/ECF p. 3).

3

- In May 2019, Greuter was stopped by the Kearney Police Department and his passenger, Ronnie Randolph, was arrested with approximately 30 grams of suspected methamphetamine. After the arrest, Randolph informed Kuebler that he had purchased marijuana from Greuter on three occasions, the most recent purchase occurring approximately six weeks prior to the stop. ([Filing No. 115 at CM/ECF p. 132](#)).

- Kuebler and other task force officers conducted a federal proffer interview of an individual in Kearney in October 2019. During that interview, the individual stated he or she had been in the basement of Greuter's residence and had observed packages of marijuana that were stacked floor to ceiling. ([Filing No. 115 at CM/ECF p. 133](#)). Greuter told the individual he received 100-pound shipments of marijuana and 20-pound shipments of methamphetamine from Oregon. The individual stated that beginning in December 2018, he or she purchased one pound of marijuana per week from Greuter, and had purchased one-ounce quantities of methamphetamine from Greuter, or others to whom Greuter supplied methamphetamine. ([Filing No. 115 at CM/ECF p. 133](#); [Filing No. 116](#)).

Williamson knew that on at least four occasions prior to December 2019, Greuter had traveled to Oregon for business with a travel permit to visit Johnny Davis. The address Kuebler provided for Johnny Davis matched the name and address of Greuter's travel permits. ([Filing No. 115 at CM/ECF pp. 18-20](#)). Williamson spoke to his supervisor. They decided Williamson should search the house at the beginning of January, when it was believed that a shipment of drugs would be there.[1] ([Id.](#)) Williamson performed the scheduled December 4, 2019 visit but did not perform an extensive search because he believed Greuter would not have any drugs on the property if he knew Williamson was coming. ([Filing No. 115 at CM/ECF p. 21](#)). Williamson made arrangements to perform an unannounced

---

[1] Williamson testified he and his supervisor, Brad Henrie, were terminated due to their work in this case because of the delay between receiving the information and the date of the search. He and parole officer Alexander Moreno testified that the delay was attributed to the information received from law enforcement, the alleged timing of the drug delivery, and the likelihood of finding a violation during an unannounced visit versus a pre-arranged visit. Williamson filed a grievance regarding the termination, and he was exonerated. Williamson and Henrie were both reinstated. ([Filing No. 115 at CM/ECF p. 52](#)).

4

search of Greuter's property on January 8, 2020, with law enforcement present for safety reasons. (Filing No. 115 at CM/ECF p. 22).

On January 8, 2020, Williamson called Greuter and asked to meet at Greuter's job site in Kearney. Parole officers Williamson and Alexander Moreno met Greuter at the job site and informed him that they would conduct a search of Greuter's residence. Greuter was transported to his home, where law enforcement officers were waiting. Greuter was handcuffed and seated at the kitchen table. (Filing No. 115 at CM/ECF p. 105). Williamson informed Greuter's girlfriend that a search would be conducted, and that she was allowed to stay at the kitchen table or leave. She chose to leave.

Upon entry into the kitchen, Moreno observed a "glass drug paraphernalia pipe" by the kitchen sink. (Filing No. 115 at CM/ECF pp. 30, 106-108). Moreno asked Greuter about the pipe. Greuter responded that it was not his. Moreno advised that while on parole, it is Greuter's obligation to know what is in his home. (Filing No. 115 at CM/ECF p. 108). The drug paraphernalia found in the kitchen was field tested and was positive for methamphetamine residue. (Filing No. 115 at CM/ECF p. 43) After being advised of his Miranda rights. Greuter agreed to speak to the parole officers, but not to law enforcement.

Law enforcement officers performed a brief walk-through of the residence to ensure there were no other people inside, then Williamson searched the basement. Kuebler joined Williamson in the basement. He looked inside a freezer, a cooler, and shined his flashlight in an area of exposed ceiling. Kuebler noted the cooler was empty but for a dryer sheet, and the cooler smelled of marijuana. Moreno searched the bedroom. (Filing No. 115 at CM/ECF pp. 30-33). Moreno found a small jar marijuana in the bedroom closet, and a bong. (Id.) Moreno asked if Greuter would permit a search of the adjacent property. Greuter initially said no,

5

but when Moreno asked whether Greuter was refusing to submit to a search, Greuter indicated where Moreno could find the keys by nodding his head toward the location of the keys hanging on the wall.[2] (Filing No. 115 at CM/ECF pp. 32-33). No threats or coercion were used to gain Greuter's consent. Greuter told the parole officers that his adjacent property was vacant, and the only he and his girlfriend could access it.

Law enforcement walked through the property first, while Williamson waited outside. Kuebler returned to the front door and stated that he had seen a can of ammunition, a black gun case and a gun safe in plain view. (Filing No. 115 at CM/ECF pp. 39, 148-149). Williamson entered the home and found it unoccupied; there was no property inside except for the safe, the guns, and a jar of marijuana. At that time, Williamson stated that having seen both parole and law violations, the parole office employees were done searching the house and the investigation was turned over to law enforcement. (Filing No. 115 at CM/ECF p. 40). When asked, Greuter stated that neither the guns nor the safe were his property. (Filing No. 115 at CM/ECF p. 115).

Kuebler applied for and received a search warrant based on the objects observed during the parole search of the residence and adjacent property. (Filing No. 115 at CM/ECF p. 155).

On March 25, 2022, Greuter filed a motion to suppress evidence and statements. (Filing No. 93-1; Filing No. 93-2). Greuter argues the search of his property "amounted to an unreasonable search and seizure because it was not based on reasonable suspicion and because Greuter possessed an expectation of privacy that was further reinforced by the established practices of the parole

---

[2] During their testimony. both Moreno and Williamson used this physical gesture (the head nod toward the keys) while explaining how they located the keys to the adjacent property.

6

office" throughout his parole supervision. ([Filing No. 93-2 at CM/ECF p. 7](#)). He asserts the information the parole officer relied upon was stale and there was no articulable and objective basis or reasonable belief that evidence of a crime would be found upon a search of his property. Thus, he argued, there was no probable cause for the search and all evidence gathered should be suppressed.

## ANALYSIS

The Fourth Amendment protects against unreasonable searches and seizures of a person's papers and effects. U.S. Const. amend. IV. In his opening brief, Greuter argued that the orchestrated search on January 8, 2020 amounted to an unreasonable search and seizure because it was not based on reasonable suspicion and because Greuter possessed an expectation of privacy that was reinforced by the established practices of the parole office. ([Filing No. 93-2 at CM/ECF p. 2](#)). Greuter argues that even though he signed a search waiver as a condition of release to parole, the parole officer was not permitted to enter and perform a warrantless search of his residence and adjacent property.

The government argues that the search was valid, either because there was reasonable suspicion to believe that Greuter was engaged in criminal activity, or because Greuter consented to the warrantless search as a condition of his parole and the search was not executed in an arbitrary, capricious, or harassing manner.

Based on the stated and implicit arguments raised by the defendant during the suppression hearing itself, the parties were granted the opportunity to submit post-hearing briefs to further explain or refine their arguments on the following specific questions:

1. Does the fact that the parole officer did not fully exercise the right to search during past parole supervision reinstate, in whole or in part, a parolee's right to privacy?

7

2. Does information provided to a parole officer become stale after one month? (Why is it unreasonable for a parole officer to wait a month if they are doing so in anticipation of a shipment arriving?)

3. If the Parole Board's protocol is more restrictive than Nebraska or Federal law, does a violation of the protocol mean there was a violation of the Fourth Amendment?

4. Does the fact that the law enforcement officer does not believe he has probable cause to obtain a search warrant somehow negate an otherwise lawful search by a parole officer?

5. Does the fact that a law enforcement officer participated in the parole search make the parole search illegal?

6. Did the defendant consent to the search by signing the search provision in his parole agreement?

See (Filing No. 115 at CM/ECF pp. 167-169).

The post-hearing briefs are filed, and the motion is now fully submitted. As explained below, upon consideration each of the issues raised in the pre- and post-hearing briefs, the undersigned magistrate judge finds the motion to suppress should be denied.

   I.   Search as a Condition of Parole

The government argues that under Nebraska law, Williamson and Moreno were permitted to search Greuter, his residence, and the adjacent property under his ownership and control based on the search condition in his parole agreement – without a showing of reasonable suspicion. Greuter does not challenge the validity of the search provision. Rather, he argues that he retained an expectation of privacy at the outset of his parole because the search clause contained "limiting and ambiguous language." (Filing No. 118 at CM/ECF p. 20).

In Samson v. California, 547 U.S. 843, 854 (2006), the Supreme Court held

that absent any evidence that the officer acted arbitrary, capricious or in a harassing manner, "[t]he Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." Samson, 547 U.S. at 857. The Court found that parole is an established variation on imprisonment of convicted criminals," and parolees "have severely diminished expectations of privacy." Id. at pp. 850, 852. The State, on the other hand, has "substantial" and "overwhelming" interests in "supervising parolees because 'parolees . . . are more likely to commit future criminal offenses.'" (Samson, 547 U.S. at 853). The State has "interests in reducing recidivism and thereby promoting reintegration and positive citizenship among" parolees, and those interests "warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." (Samson, 547 U.S. at 853).

Greuter attempts to distinguish Samson, arguing the rates of recidivism and differences between parole and probation in California versus Nebraska render Samson inapplicable to this case. But Samson's overarching federal constitutional analysis is applicable to every state, irrespective of any nuanced differences in a specific state's statutes and administrative procedures. Every state, including Nebraska, has an interest in assuring that those released from prison become law-abiding citizens, and Samson held that this interest justifies severely limiting a parolee's expectation of privacy and as a condition of parole, allowing residential searches absent reasonable suspicion. The court rejects any claim that Samson's Fourth Amendment reasoning is applicable to California but not Nebraska.

Greuter's parole search condition permitted suspicionless searches and the evidence shows that the search of the residence and adjacent property were not conducted in an arbitrary, capricious, or harassing manner. The search occurred on a weekday morning and after being contacted at work, Greuter was notified of the officer's intentions. They approached Greuter at his job site, asking to speak with him privately; the exchange was not designed to be conspicuous or

9

embarrassing. The parole officers did not act in any coercive or threatening manner throughout the exchange and subsequent search. The unannounced search was planned and executed in response to corroborated information that Greuter received regular shipments of marijuana and methamphetamine at his home and that he was involved in the ongoing distribution and sale of the drugs. Upon information and belief that shipments would be received during the first week of the month, the search was scheduled for a time when parole officers expected evidence of a suspected parole violation would be present in the home. Under the circumstances, an unannounced search of Defendant's properties was appropriate with or without suspicion, and was authorized by the parole condition allowing searches "at such times as [the parole officers] deem necessary." (Filing No. 101-5 at CM/ECF p. 3).

Nonetheless, Greuter now argues that his consent to the searches under the parole agreement[3] was limited to "routine" searches, which implies "there were some established practices for how they would be conducted." (Filing No. 118 at CM/ECF p. 15). Previous prearranged visits with Williamson included sitting down at the kitchen table to talk, and Williamson glancing inside of Greuter's refrigerator to check for evidence of alcohol. Thus, Greuter argues that the unannounced search of his properties on January 8, 2020 was beyond the scope of the "routine" searches allowed, he had a reasonable expectation of privacy in the areas not routinely searched by the parole office, and the evidence found during the January 8, 2020 search should be suppressed. Essentially, he argues that even though he

---

[3] In this case, the search condition states:
> You shall permit your parole officer and/or personnel of Parole Administration to conduct routine searches of your person, residence, vehicle or any property under your control, at such times as they deem necessary.

(Filing No. 101-5 at CM/ECF p. 3). The search condition in this case is generic, allowing a warrantless search when a parole officer deems it "necessary."

was aware of the search condition, he was lulled into believing that a thorough search of his property would not occur because that had never occurred before.

Greuter argues that patterns or practices can either create reasonable expectations of privacy or extend them. Citing United States v. Kitchens, 114 F.3d at 29 (4th Cir. 1997), and others, Greuter compares the expectation of privacy of a hotel guest occupying a room after checkout to the instant case. These circumstances are not analogous, and the court does not find these arguments persuasive because, as a parolee, Greuter does not possess the same right to privacy that a hotel guest has either before or after checkout.

The use of the word "routine" in the search clause is clearly meant to authorize searches occurring with some regularity or repetition. In his brief, Greuter argues he "clearly did not expect Williamson to search the adjacent residence or he would not have had a gun safe in there with two guns sitting outside. Or, he would have transferred ownership of the residence to Easley so as to distance himself from her gun collection." (Filing No. 118 at CM/ECF pp. 18-19). This argument is precisely why a parole officer should not be limited to viewing only the areas previously searched. Doing so would allow a parolee to more easily conceal evidence of parole violations.

Greuter also argues that "he had no expectation of privacy in his refrigerator after the first time Williamson had searched it." (Filing No. 118 at CM/ECF p. 18). Applying this logic, Williamson would have had to search the exact same areas of the home each time he visited, or he would have had to do a thorough search of the areas searched on January 8, 2020 during one of the prior visits to put Greuter on notice that those areas would or could be subject to a future search. This interpretation of the search and seizure clause is irrational and impractical. Greuter's narrow interpretation of the search clause would allow parolees to

11

circumvent the purpose of the search and seizure clause, thereby undermining the legitimate interests of Nebraska in reducing recidivism and contributing to the rehabilitation of the parolee. See Samson, supra. Moreover, Greuter has not cited, and this court has not found, any case law to support the assertion that a pattern or practice of conducting minimal searches somehow reinstates a parolee's privacy rights such that later, more thorough, searches are unlawful absent consent or a warrant.

II. Reasonable Suspicion

The government argues that even assuming Greuter's parole agreement did not include a valid consent to search without reasonable suspicion, the search was valid because the officers had reasonable suspicion to believe Greuter was engaged in criminal activity. U.S. v. Knights, 534 U.S. 112 (2001), held a warrantless search of a parolee based upon reasonable suspicion is lawful under the Fourth Amendment. See also, United States v. McCoy, 847 F.3d 601, 605 (8th Cir. 2017) (holding warrantless, random searches as a condition of pretrial release did not violate the Fourth Amendment where the pretrial officer had reasonable suspicion to believe a crime was being committed).

"Reasonable suspicion exists when, considering the totality of the circumstances known to the officer at the time, the officer has a particularized and objective basis for suspecting wrongdoing." United States v. Kuhnel, 25 F.4th 559, 564 (8th Cir. 2022), quoting United States v. Hamilton, 591 F.3d 1017, 1022 (8th Cir. 2010). "Innocent facts, when considered together, can give rise to a reasonable suspicion. This is especially true when we view the totality of the circumstances through the perspective of an experienced law enforcement officer trained in crime detection and acquainted with the behavior of criminals." United States v. Lebrun, 261 F.3d 731, 733 (8th Cir. 2001). Courts consider an officer's

12

experience when assessing whether facts that might otherwise seem innocuous to a lay person are suspicious in the eyes of an experienced officer.

Here, Kuebler, a highly experienced officer, approached Williamson with information received in 2018 and 2019 implicating Greuter in a scheme to receive and sell methamphetamine and marijuana. The alleged origin of the contraband was Johnny Davis, a former Nebraska resident, residing in Oregon. Williamson's records indicated that, while on parole, Greuter was given travel permits to visit Davis in Oregon on several occasions between 2017 and 2018. In addition, there were at least three vehicles registered to Davis at Greuter's home address. In May 2019, a passenger in Greuter's car possessed methamphetamine and the passenger told investigators that he had purchased the methamphetamine found on his person from Greuter, admitting that he had purchased from Greuter on multiple prior occasions. Taken together, this information is more than a "hunch" and gives rise to reasonable suspicion that criminal activity may be afoot. See Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000), quoting Terry v. Ohio, 392 U.S. 1, 27 (1968).

Kuebler shared the information with Williamson in December 2019, after corroborating the information received during a federal proffer interview in October 2019 with information available in the Nebraska Criminal Justice Information System. Greuter asserts this information was stale because it dated back to between 2018 and September 2019 and the property search did not take place until January 2020. He asserts the government failed to "establish a timeframe that would establish when the activity started, the frequency of the activity, when the last activity occurred, and whether the activity could reasonably be expected to continue." (Filing No. 118 at CM/ECF p. 21).

There is "no bright-line test for determining when information in a warrant is

13

stale." United States v. Johnson, 848 F.3d 872, 876 (8th Cir. 2017). "The passage of time is less important in deciding whether information is stale 'when the facts recited indicate activity of a continuous nature.' " United States v. Smith, 21 F.4th 510, 514 (8th Cir. 2021), citing United States v. Maxim, 55 F.3d 394 (8th Cir. 1995). When there is information indicating that the activity is continuous, the Eighth Circuit has upheld lengthy time periods rather than finding that information to be stale. See; United States v. Lemon 590 F.3d 612, 614 (8th Cir. 2010) (eighteen months); Maxim, 55 F.3d 394, 397 (three years as to one witness's statements; four months as to another's). Here, law enforcement had information indicating Greuter was distributing drugs in 2018, along with additional allegations regarding the sale of the same substances on multiple occasions in 2019. Such information reflected a potential continuous pattern of behavior. Kuebler was not relaying stale information when he spoke to Williamson in late-2019.

Kuebler contacted Williamson on December 3, 2019 regarding his belief that Greuter was engaged in ongoing criminal activity and that evidence of that criminal activity would be present at Greuter's home. Williamson testified that he did not perform an extensive search of the property during his next scheduled visit because it was unlikely that Greuter would keep evidence of a crime at the property when he was already expecting a visit from his parole officer. Instead, an unannounced parole search was planned for January 8, 2020, a date when Williamson expected, based on the information he received, that a shipment of drugs would be at Greuter's property, and when Greuter would not expect a visit from the parole officers. Given the ongoing and monthly pattern of alleged criminal activity, the information regarding drug activity received by Williamson in December 2019 did not become stale by January 8, 2020.

To summarize, the information Williamson acted on in planning and executing the parole search of the property in January of 2020 was not stale and

fully supported reasonable suspicion to believe that Greuter was engaged in ongoing criminal activity and in violation of his parole agreement. Having reasonable suspicion to believe evidence of criminal activity would be present in Greuter's home and/or adjacent property, the parole officer did not violate the Fourth Amendment by entering the home to conduct a search. Griffin v. Wisconsin, 483 U.S. 868, 873–74 (1987) (holding that a state regulation allowing warrantless searches of a probationer's home upon reasonable suspicion of a probation violation was reasonable under the special needs exception to the warrant and probable cause requirements of the Fourth Amendment). Further, the officers' suspicion was enhanced after they entered the residence and found drug paraphernalia in plain view. After viewing the pipe, which pretested for methamphetamine, the parole officers had further reasonable suspicion to fully search the properties within Greuter's control.

### III. Participation by Law Enforcement

Greuter argues that he had consented to the "searches protocol," or the established practices of the parole office and that protocol was allegedly not following in this case. Greuter argues that Williamson was not permitted to conduct a search "to circumvent law enforcement warrant protocols or help them to gather probable cause for a warrant." He argues that the search was conducted to assist Kuebler, who did not believe he had sufficient information to obtain a warrant, and that law enforcement officers impermissibly participated in the search of the property.[4] Greuter argues that a fair interpretation of the search clause in the certificate of parole would not include a search conducted by law enforcement.

---

[4] Kuebler did not believe he had probable cause, but his subjective belief is not relevant under the Fourth Amendment. Viewed objectively, an informant provided information to law enforcement that was further corroborated through law enforcement investigation and information obtained from Williamson, Kuebler and Williamson shared their information regarding Greuter. As a result, both he and Kuebler had probable cause to search.

15

The Eighth Circuit has held that police involvement in parole searches becomes unlawful when the search is "nothing more than a ruse for a police investigation." United States v. McFarland, 116 F.3d 316, 318 (8th Cir. 1997). However, "parole officers may work with police officers provided the parole officers are pursuing parole-related objectives." United States v. Brown, 346 F.3d 808, 811 (8th Cir. 2003). And when pursuing these objection, parole and probation officers are not required "to choose between endangering themselves by searching alone and foregoing the search because they lacked the resources and expertise necessary to search alone safely." United States v. Brown, 346 F.3d 808 (8th Cir. 2003). Nebraska parole officers are unarmed and would have justifiable safety concerns when executing an unannounced and thorough search of a parolee's property. They have no idea if others will be present in the home and whether they are armed.

While a search pursuant to the search clause of Greuter's Parole Agreement should be conducted by parole officers and/or personnel of Parole Administration, the search of Greuter's properties was conducted primarily by parole officers, with law enforcement on site to provide security and a walk through of each property to ensure there were no other individuals inside the properties that would present a threat. It is well-known that there are inherent dangers involved in the drug trade; Guns and drugs are frequently found and used together. U.S. v. Moore, 212 F.3d 441 (8th Cir. 2000), quoting United States v. Betz, 82 F.3d 205 (8th Cir. 1996). Greuter was on parole following two felony drug distribution convictions, and he was suspected of further drug-related activity. Upland is a small rural town with a minimal police presence. It was not unreasonable for Williamson, who received information indicating Greuter was involved in criminal activity, to arrange for law enforcement to be present and conduct a protective sweep to ensure the safety of all involved.

16

There is sufficient evidence that Williamson planned the unannounced visit to Greuter's property to verify whether Greuter was in compliance with his parole conditions based upon the information he received from law enforcement regarding Greuter's prior contacts with law enforcement, confidential information and federal proffer statements. The search protocol sets a "reasonableness" standard in determining whether to conduct a search.[5] The reasonableness standard is discretionary and is based upon the officer's belief from information received that a parolee is violating their parole. Under the circumstances presented, the search was reasonable and the presence, backup assistance and participation by law enforcement officers did not negate the lawfulness of Williamson's search of the property. The search was conducted in pursuit of parole-related objectives under the protocol and pursuant to the search and seizure clause of the certificate of parole.

Nebraska's policy prohibiting the use of parolee searches as a means of "circumvent[ing] law enforcement warrant protocols or help[ing] them to gather probable cause for a warrant" does not prohibit law enforcement presence. And it certainly does not prevent a parole officer from deciding a search should be conducted based on information received from a law enforcement officer.[6] And even assuming this tortured interpretation of the Nebraska's policy is applied, the question before this court is whether the search violated the Fourth Amendment. Relying on law enforcement for information, protection, and assistance during a valid parolee search does not violate the Fourth Amendment.

---

[5] Reasonableness shall be determined by: 1) The scope of the particular intrusion; 2) The manner in which the search is to be conducted; 3) Justification for initiating the search (the who, what, when, where, and why of the information received by the officer to make him/her belief the client is violating his/her parole certificate); and, 4) The place in which the search is to be conducted.

([Filing No. 108-1 at CM/ECF p. 1](#)).

[6] Williamson testified that he would have conducted the search even had the tip been received (as Greuter suspected) from Greuter's son. In either case, he would have considered the information sufficiently reliable.

17

V. Conclusion

The search in this case was not conducted in an arbitrary, capricious, or harassing manner, and it was not done as a subterfuge for performing a warrantless criminal investigation. On January 8, 2020, the unannounced visit was initiated because Williamson received credible, corroborated information that Greuter was involved in ongoing behavior that violated his parole conditions. Even if the search had not been supported by reasonable suspicion, Greuter knowingly and voluntarily consented to the search of his properties as a condition of his parole and he had no reasonable expectation of privacy in the properties searched. Greuter's Fourth Amendment rights were not violated, and his motion to suppress should be denied.

Accordingly,

IT IS RECOMMENDED to the Honorable John M. Gerrard, United States District Judge, that the motion to suppress, (Filing No. 93), be denied in in its entirety.

The defendant is notified that failing to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation

IT IS ORDERED,

Trial of this case is set to commence before the Honorable John M. Gerrard, United States District Judge, in Courtroom 1, United States Courthouse, Lincoln, Nebraska, at 9:00 a.m. on October 11, 2022, or as soon thereafter as the case

may be called, for a duration of five (5) trial days. Jury selection will be held at commencement of trial.

Dated this 2nd day of September, 2022.

BY THE COURT:

<u>*s/ Cheryl R. Zwart*</u>
United States Magistrate Judge